Dan **HOUSER** and Sallie Hadnott on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Kenneth **HILL,** Philip Wood, Norris Champion, and O. C. Thompson, Defendants and Plaintiffs in Counterclaim,

v.

Dan **HOUSER,** Sallie Hadnott, Student Nonviolent Coordinating Committee, Charlie Levine, James Edward Harris, Santee Burnett, Doc Davis, John Jackson, Ulyssis Z. Nunnally, Will Henry Rogers, and H. Rap Brown, as members, officers, supervisory agents, agents, and representatives of the Student Nonviolent Coordinating Committee, Autauga County Voters Association, by and through its officers, members and supervisory agents, including Freddie Lee Davis, Sallie Hadnott and Dan Houser, and Autauga County Improvement Association, by and through its officers, members and supervisory agents, including Freddie Lee Davis and Dan Houser, Defendants in Counterclaim.

Civ. A. No. 2564-N.

United States District Court
M. D. Alabama, N. D.

Jan. 16, 1968.

Solomon S. Seay, Jr. (of Gray & Seay), Montgomery, Ala., for plaintiffs and for the Autauga County Voters Association, defendant in counterclaim.

Vaughan Hill Robinson and Joseph D. Phelps (of Hill, Robison, Belser & Phelps), Montgomery, Ala., for defendants.

Howard Moore, Jr. (of Ward, Moore & Alexander), Atlanta, Ga., for the Student Nonviolent Coordinating Committee, Charlie Levine, James Edward Harris, Santee Burnett, Doc Davis, John Jackson, Ulyssis Z. Nunnally, Will Henry Rogers, and H. Rap Brown, defendants in counterclaim.

## MEMORANDUM OPINION AND ORDER

JOHNSON, District Judge.

The plaintiffs, as Negro resident citizens of Autauga County, Alabama, and as members of the class they represent, filed with this Court on June 14, 1967, their complaint—which included a claim for monetary damages—a motion for preliminary and permanent injunctions, and a motion for a temporary restraining order. On July 19, 1967, this Court by formal order denied the plaintiffs' request for a temporary restraining order which was sought without notice to the defendants and without the Court's hearing any testimony in support thereof.

Jurisdiction is invoked by the plaintiffs pursuant to Title 28, United States Code, Sections 1331, 1343 and 1346, and also pursuant to Title 42, United States Code, Section 1983. The plaintiffs' action seeks relief from the denial of the equal protection of the laws under the Fourteenth Amendment to the Constitution of the United States and seeks redress of the deprivation of rights, privileges and immunities guaranteed by the First, Fourteenth and Fifteenth Amendments to the Constitution of the United States as implemented by Congressional enactments. The defendants, with the exception of the party designated by plaintiffs as "Dave" Hill, who, according to the evidence in the case was identified as being Prattville City Police Officer Rayburn Hill (upon whom, the file reflects, service of the complaint was never perfected, and who has made no appearance in this case other than as a witness), in an answer and counterclaim deny that the plaintiffs, or any members of the class they represent, have been denied equal protection of the laws and deny further that there has been any deprivation of rights, privileges and immunities guaranteed these plaintiffs or any members of the class they represent under any provision of the Constitution of the United States. Defendants in their counterclaim ask that the plaintiffs and other members of the class they

represent, together with additional parties brought in pursuant to Rule 13(h), Federal Rules of Civil Procedure,[1] and all persons acting in concert with them, be enjoined and restrained from the organization of violent and unlawful actions; from inciting violence; from the unlawful use of firearms; from organizing demonstrations, marches and gatherings in which the practice of violence and the unlawful use of weapons is advocated; from advocating the employment of weapons and violence in such demonstrations; from the use of weapons in activities of the plaintiffs, the class represented by them and the additional parties to the action; from marching and demonstrating in public without giving adequate written notice, and from demonstrating or parading in the nighttime.

The additional parties that the defendants sought to bring in consist of the Student Nonviolent Coordinating Committee; H. Rap Brown, Stokely Carmichael, Ulyssis Z. Nunnally, Will Henry Rogers, Charlie Levine, James Edward Harris, Santee Burnett, Doc Davis, and John Jackson, as agents of the Student Nonviolent Coordinating Committee; the Autauga County Voters Association, and the Autauga County Improvement Association. Motions to dismiss the counterclaim were filed by the Autauga County Voters Association and the Student Nonviolent Coordinating Committee, Ulyssis Z. Nunnally, Will Henry Rogers, H. Rap Brown and Stokely Carmichael. These motions to dismiss, except for the motion filed on behalf of Stokely Carmichael, were denied. Kelly v. Page, 335 F.2d 114, 118 (5th Cir. 1964); Turner v. Goolsby, 255 F.Supp. 724, 729–730 (S.D.Ga.1966) (three-judge court); Cottonreader v. Johnson, 252 F.Supp. 492, 497 (M.D.Ala.1966). See Gamble v. City of Dublin, Georgia, 375 F.2d 1013 (5th Cir. 1967). Compare Kelly v. Page, supra, with Congress of Racial Equality v. Clemmons, 323 F.2d 54 (5th Cir. 1963). As to the motion filed on behalf of Carmichael, after this Court had given the counterclaiming defendants additional time in an effort to perfect service on Carmichael, and after counsel for the counterclaimants acknowledged that there was no reasonable probability of perfecting this service, defendants' counterclaim as to Carmichael was dismissed for the reason that defendants had not served him with notice of the action. Answers were filed on behalf of all remaining defendants in the counterclaim with the exception of the Autauga County Improvement Association, John Jackson, Charlie Levine, James Edward Harris, Santee Burnett, and Doc Davis.

The plaintiffs' motion for a preliminary injunction against the defendants and the defendants' motion for a preliminary injunction against the plaintiffs and the additional parties, and the members of their class, were submitted upon the pleadings, upon the testimony of some 45 witnesses, upon the several exhibits offered and admitted in connection with that testimony, and upon the briefs and arguments. Upon this submission, this Court now proceeds in this memorandum opinion to make appropriate findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.[2]

The defendant Philip Wood was and is presently the Sheriff of Autauga County, Alabama, and as such is engaged in said county in the enforcement of the laws of the State of Alabama. The defendant O. C. Thompson is, and was at all times material to this case, the Chief of Police of the City of Prattville, Autauga County, Alabama, and as such is engaged in the enforcement of the laws of the State of Alabama and the

---

1. Rule 13(h), Federal Rules of Civil Procedure:

    "Persons other than those made parties to the original action may be made parties to a counterclaim or cross-claim in accordance with the provisions of Rules 19 and 20."

2. This Court by order of September 22, 1967, and by agreement of the parties, continued the issue as to claimed damages until further order of the Court.

ordinances of the City of Prattville and generally directs and supervises the official activities and conduct of the members of the police force of Prattville, Alabama. The defendants Kenneth Hill and Norris Champion, and Rayburn Hill, were acting as and, as far as this Court knows, continue to act as police officers for the City of Prattville, Alabama, and as such are engaged in the enforcement of the laws of the State of Alabama and the ordinances of the City of Prattville and generally, under the direction of the Chief of Police and the other governing authorities for said city, carry out the duties normally performed by police officers in municipalities in Alabama.

The Student Nonviolent Coordinating Committee, an unincorporated association, was transacting business in Autauga County, Alabama, in this district, by and through its members and officers and supervisory agents, including Charlie Levine, James Edward Harris and Santee Burnett, all resident citizens of Autauga County, Alabama. H. Rap Brown, a counterclaim defendant, according to the evidence in this case was at all times herein material an agent of the Student Nonviolent Coordinating Committee. The Autauga County Voters Association is an unincorporated association operating in Autauga County, Alabama, by and through its officers, including Freddie Lee Davis, Sallie Hadnott and Dan Houser, all resident citizens of Prattville, Autauga County, Alabama. The Autauga County Improvement Association, also a counterclaim defendant, is an unincorporated association operating in Prattville, in Autauga County, Alabama, at all times material to this case, through its agent and officer, Dan Houser. These organizations and the individuals operating and directing them have as their general purposes registration of Negroes in Autauga County, Alabama, for the purpose of qualifying to vote; assistance and advice as far as general public welfare benefits for members of the Negro race are concerned, and other programs and activities intended and designed generally to improve the lot of Negro citizens of Autauga County and Prattville, Alabama.[3]

On Sunday, June 11, 1967, the plaintiffs, together with other members of their organization living in the City of Prattville, Alabama, at approximately

---

3. Some historical bases, as reflected by the official records of this Court, probably giving justification for the activities of these individuals and organizations are:

(1) Civil Action No. 2139–N, instituted by the United States in 1964 pursuant to Title III of the Civil Rights Act of 1960, reflects that the Attorney General of the United States, based upon information in his possession tending to show that distinctions on the basis of race or color had been made with respect to registration and voting within Autauga County, Alabama, made a demand of the members of the Board of Registrars of Autauga County, Prattville, Alabama, that the voter registration records of said county be made available for inspection and copying. It was necessary that this Court enter an order directing the members of the Board of Registrars of Autauga County, Alabama, to make their voting registration records available for inspection and copying.

(2) The Negro voting-age population in Autauga County in 1960 was 3,651. The white voting-age population as of this same date was 6,353. As of August 31, 1967, in excess of 100 percent of the white voting-age population was registered to vote. There was 65.2 percent of the Negro voting-age population in the county registered to vote; hence, as of August 31, 1967, one-third of the Negroes of voting age in Autauga County, Alabama, were not registered to vote.

(3) This Court in November 1967, in Smith, etc., et al. v. King, Commissioner, etc., et al., 277 F.Supp. 31, determined that the Alabama State Department of Pensions and Security had since June 1964, through the use of a "substitute father" regulation, illegally and unconstitutionally removed from the Alabama rolls of Aid to Dependent Children approximately 16,000 children. The Alabama State Department of Pensions and Security, acting through its Autauga County officials, had removed from its Aid to Dependent Children rolls in Autauga County, through the use of said illegal and unconstitutional regulation, a substantial number of Negro children.

3:00 p. m. convened for one of their routine meetings. Approximately 75 to 100 Negroes were present. The meeting was conducted in the churchyard of a Negro church directly across the street from the office of the Autauga County Improvement Association. Stokely Carmichael had been scheduled to speak at this meeting, and he arrived for this purpose at approximately 3:00 p. m. The meeting opened with some singing, preliminary announcements and short talks, and then Carmichael commenced his speech. The events that transpired are quite vividly described by a witness, Nitricia Hadnott, a sixteen year-old Negro girl and daughter of the plaintiff Sallie Hadnott. This Court finds the testimony of Nitricia Hadnott to be credible, accepts it as such and, to the extent that it is hereinafter set out in Appendix "A" hereto, makes it a part of the findings of fact of this Court.

This Court specifically finds from the credible evidence presented upon this hearing that while the incident between Carmichael and the police officers described in Nitricia Hadnott's testimony was taking place in the churchyard, the police officers from Prattville, Alabama, who are defendants in this case assaulted a representative of the press who was attempting to take photographs of the meeting and the altercation, and confiscated his camera. The defendant police officers also forcibly confiscated the recording equipment that was being used by the news director of a Montgomery, Alabama, radio station for the purpose of recording what was said upon the occasion by the various participants. Except to the extent as reflected by the testimony of Nitricia Hadnott, Stokely Carmichael was not involved in any of the altercation since he was from the time of his arrest between 3:00 and 4:00 p. m. on Sunday, June 11, until he was released on Tuesday, June 13, in the Autauga County Jail in custody of the defendant Sheriff Wood. The evidence further reflects, and this is without dispute, that the counterclaim defendant H. Rap Brown did not arrive in either Prattville or Autauga County, Alabama, until sometime on Tuesday, June 13, 1967, when the disturbance had been quelled and everything was under control. When Brown did arrive in the Prattville area on Tuesday, June 13, he issued the news release that is attached hereto as Appendix "B." The evidence reflects that this news release as made by Brown and Brown's responses to certain questions put to him by newsmen, these responses being of the same general tenor as the statements set forth in the release, were the only connection that H. Rap Brown had with the entire episode.

That part of the incident immediately preceding the arrest of Carmichael, including what Carmichael had to say to the officers and the officers to Carmichael, is reflected in considerable detail by the notes taken by the witness Sandra Colvin, who was attending the meeting that Sunday afternoon in her capacity as a newspaper reporter. These notes, which are attached hereto as Appendix "C," reflect the conversation and to some extent the activities of the participants.[4]

After Carmichael was arrested and while three or four armed officers remained at or near the meeting in the churchyard, the plaintiffs and others who were participating in the meeting left the churchyard scene, and about 4:20 p. m. on June 11, 1967, went to the home of Dan Houser, located in the Happy Hollow area of Prattville, and there continued their meeting, the activities of which consisted of speech-making and singing. While the meeting was in progress, sometime around "first dark" and while at least one police car for the City of Prattville was patrolling the general area, shots were fired by some unknown individual or individuals either from the police car or cars or from some point near where the police car or cars

---

4. In connection with that testimony see Brown v. Clark, 274 F.Supp. 95 (E.D.La. 1967). The use of firearms as a means of social protest is *not* a constitutionally protected form of expression.

were patrolling; the meeting immediately broke up, with some 30 to 45 participants finding refuge in Dan Houser's house. From this point on, until about 2:00 a. m. on Monday, June 12, Prattville, Alabama, literally became an armed camp. Without any question, some Negroes not further identified by the evidence armed themselves with guns, rocks and other missiles. Numerous members of the Alabama State Troopers arrived; all available deputies and special deputies for Autauga County were called into active duty, and in the early part of the evening of June 11, Sheriff Philip Wood, through the Governor of the State of Alabama, had a contingent of the Alabama National Guard sent to the Prattville area. After these various law enforcement agencies coordinated their plans, they proceeded to the area of Dan Houser's home, and through the use of a loudspeaker Sheriff Philip Wood ordered Houser and the other Negroes to come from the house. Houser came out, was placed in an automobile with Prattville police officers, and was taken to jail—the Prattville City Jail—where he remained until he was released the next day. Some 10 to 12 other Negroes who were at or near Houser's house were also arrested and taken to jail. All but Houser were taken to the Autauga County Jail in the custody of the defendant Philip Wood. Houser, as stated earlier, was taken to the Prattville City Jail. This Court further finds that, at some time during the period from the time that Dan Houser was arrested and placed in the custody of the defendant city police officers during the night of June 11–12, 1967, until he was released from the Prattville Police Station sometime during the day of June 12, 1967, he was severely beaten about the face, head and body either by Prattville police officers or, with the knowledge and consent of said police officers, by someone else while Houser was in the custody of said police officers. Several other Negroes were also struck by the officers during this phase of the incident. Houser was released without being charged with any criminal offense. The Negroes arrested and taken to the Autauga County Jail were charged with unlawful assembly. They have not yet been tried. A large group of hostile white people, not further identified by the evidence, were allowed to congregate and remain at or near the Prattville City Hall during the night of the 11th and the morning of the 12th.

The evidence also reflects that after nightfall on Sunday, June 11, in the Happy Hollow area of Prattville, rocks and bottles were thrown at automobiles, two police cars were fired on by unknown individuals and a special deputy sheriff, a city policeman and a Kilby Prison "dog boy" (who had been brought to the scene for the purpose of using State of Alabama bloodhounds) were each wounded to a minor extent by shotgun pellets. The evidence does not reflect whether the shotgun or shotguns that wounded these individuals were fired by Negroes, by officers or by some other individuals who, the evidence reflects, were on the scene to "assist" the officers.

■ The evidence is quite clear that the Negro citizens of Prattville had been concerned for some several months prior to June 1967, with what they considered to be mistreatment of Negroes by Prattville, Alabama, police officers. The onset of the real tension probably goes back to the early part of 1967, when Charles Rasberry, a Negro, was shot in the back by city officer Kenneth Hill while in the Autauga County Courthouse and while Rasberry was attempting to escape. Attempts had been made by responsible groups, both white and Negro, in the Prattville and Autauga County area to work out their various grievances and misunderstandings. However, these had not been settled to the satisfaction of either side when Carmichael appeared on the scene on June 11. This Court unequivocally and emphatically condemns any advocacy of violence or the use of violence at any time, and particularly in connection with activities that are ostensibly designed to secure full rights of citizenship to members of the minority race. However, this Court has in the

past condemned [5]—and does now equally condemn—the excessive use of force or power, or any brutality, on the part of police officials. Even though the use of the term "black power" offends the sensibilities of many citizens, both white and Negro, it cannot justify the action by and the conduct of the several members of the Prattville Police Force on June 11, 1967.[6] The use of the term by Carmichael upon that occasion did not constitute any threat of imminent danger;[7] there was no evidence that the meeting was unruly or was creating any disturbance when the defendant city police officers got out of their car with sidearms and shotguns and singled out Carmichael for arrest;[8] and when the armed city police officers continued to remain at the meeting, there was no showing that there was any clear and present danger of any disorder, disturbance[9] or interference with traffic upon the public streets,[10] or any other immediate threat to public safety. However, this Court is convinced that, after the meeting had been disturbed by the officers without sufficient justification and had been removed to Dan Houser's residence, after the initial shots were fired and in response to the illegal and "high-handed" conduct of the city officers, some of the Negro citizens who were there in attendance armed themselves with shotguns, rocks and other weapons for the purpose of harassing, and did harass, on the night of June 11, the police officers and other citizens in cars in or near the Happy Hollow area. Thus, as this Court has been required to find upon other similar occasions—Cottonreader v. Johnson, 252 F.Supp. 492 (1966)—*the fault lies on both sides.*

Upon the evidence in this case, this Court now specifically finds that the defendant Prattville police officers have either failed to discharge their duty and the obligation imposed upon them by the law or have affirmatively violated the duty and obligation imposed upon them by the law, in the following respects:

(1) By inflicting summary punishment upon Negro citizens while those Negro citizens were either in their custody or while they were attempting to render assistance in the way of posting appearance bonds or securing the lawful release of Negroes in the custody of the police officers; which said summary punishment was inflicted by said police officers for the purpose of and with the effect of deterring the said Negro citizens from the exercise of their legal and constitutional rights;

(2) By unlawfully interfering, through the use of force and intimidation, with the peaceful and lawful assemblies

5. Cottonreader v. Johnson, 252 F.Supp. 492 (M.D.Ala.1966). See quotation from that case, infra, and cases there cited.

6. Cf. Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966); Cox v. State of Louisiana, 379 U.S. 559, 574, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965); Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Feiner v. People of State of New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295 (1951).

7. Whitney v. People of State of California, 274 U.S. 357, 376, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (concurring opinion).

8. Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919); Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951).

9. Just as the State of Alabama punishes *unlawful* assembly, Title 14, Section 407, Code of Alabama 1940 (Recomp.1958), it also punishes the act of disturbing a *lawful* assembly, Title 14, Section 119, Code of Alabama. The acts of the Prattville police officers would appear to violate this latter statute. The fact that someone shouted remarks or slogans distasteful to the police officers as the officers drove by did not justify their conduct. Compare Thompson v. State, 34 Ala.App. 608, 42 So.2d 640 (1949), with Appendix "C," infra.

10. Shuttlesworth v. City of Birmingham, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965); Poulos v. State of New Hampshire, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953); Cox v. State of New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941).

of Negro citizens of Prattville, Autauga County, Alabama;

(3) By failing to provide proper police protection to Negro citizens and the members of their class in Prattville, Autauga County, Alabama, while said citizens are engaged in exercising their constitutional right to protest and demonstrate against certain alleged grievances;

(4) By arresting Negro citizens of Prattville and Autauga County, Alabama, upon pretense and subterfuge and without formally charging them with or prosecuting them for violating any law;

(5) By allowing hostile white groups to gather and congregate and by permitting these groups and the individuals composing them to engage in conduct designed to intimidate, and having the effect of intimidating, the plaintiffs and the members of their class in the exercise of their constitutional rights; and

(6) By failing to allow these plaintiffs and the members of the class they represent, and to guarantee to these plaintiffs and the members of said class, their constitutional right to meet and assemble in a peaceful and orderly manner.

The illegal activity of the plaintiffs and the members of their class helped to create the situation that existed in Prattville, Autauga County, Alabama, on June 11 and 12, 1967. This illegal activity consisted of:

(1) Sponsoring and arranging meetings and assemblies to be addressed by those who advocate violence through the use of guns and other actions designed to and tending to disrupt the peace and order of the community; and

(2) Using violent means to protest and demonstrate.

The acts and conduct of the defendant city police officers outlined above have not been directed toward enforcing any valid laws of the City of Prattville, Alabama, or the State of Alabama. By such actions and by such conduct the defendant city police officers have intimidated and harassed these plaintiffs and the members of their class

and have permitted unidentified white citizens to intimidate, threaten and assault these plaintiffs and the members of their class. The effect of this is to interfere with these plaintiffs and the members of their class in exercising certain of their basic constitutional rights; that is, the right to assemble peacefully, the right to arrange plans designed to remonstrate with governmental authorities, and the right to petition for redress of grievances. The assembly by these plaintiffs and the members of their class on Sunday afternoon, June 11, 1967, involved nothing more than a peaceful effort on their part to exercise a classic constitutional right. As this Court stated in *Cottonreader,* supra, 252 F.Supp. at 497:

"Under such circumstances suppression by public officials or police of the rights of free speech and assembly cannot be made an easy substitute for the performance of their duty to maintain order by taking such steps as may be reasonably necessary and feasible to protect peaceable, orderly speakers, marchers or demonstrators in the exercise of their rights against violent or disorderly retaliation or attack at the hands of those who may disagree and object. See generally, Brown, et al. v. State of Louisiana, [383 U.S. 131,] 86 S.Ct. 719 [15 L.Ed.2d 637] (February 23, 1966); Cox v. State of Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); /Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Fields v. South Carolina, 375 U.S. 44, 84 S.Ct. 149, 11 L.Ed.2d 107 (1963); Kelly v. Page, 335 F.2d 114 (5th Cir. 1964); NAACP, et al. v. Thompson, et al., 357 F.2d 831 (5th Cir. March 8, 1966); Hurwitt v. City of Oakland, 247 F. Supp. 995 (N.D.Calif.1965). Thus, the threat of violence or public hostility to the views of those exercising First Amendment liberties does not of itself justify denial of the right, but rather is grounds for injunctive relief. NAACP, et al. v. Thompson, et al., supra. Kelly v. Page, supra. See

Hurwitt v. City of Oakland, supra; Williams v. Wallace, 240 F.Supp. 100 (M.D.Ala.1965); United States v. Clark, 249 F.Supp. 720 (S.D.Ala., April 16, 1965); United States v. United States Klans, Knights of Ku Klux Klans, 194 F.Supp. 897 (M.D. Ala.1961). Moreover, in discharging their duties and responsibilities of keeping the streets and highways open, public authorities may impose only *reasonable* regulations designed to assure the safety and convenience of the people; they cannot, themselves, in the guise of regulations use the power or influence of their office to abridge or deny basic constitutional rights. Nor can public officials—as this Court and other courts have repeatedly emphasized—'effectively abdicate [their] * * * responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be.' Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961); Lynch v. United States, 189 F.2d 476 (5th Cir. 1951); United States v. United States Klans, Knights of Ku Klux Klan, Inc., supra; Williams v. Wallace, supra; United States v. Clark, et al., supra."

■ However, the rights of free speech and assembly, while fundamental in our society, do not mean that everyone wishing to protest in such manner may do so at any time, at any place, and under any circumstances. The right of the public to be protected from the evils of particular conduct is often a greater and more important right. Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L. Ed.2d 149 (1966).

The evidence in this case does not reflect any conduct on the part of defendant Philip Wood, Sheriff of Autauga County, Alabama, that was designed to violate or had the effect of violating any rights of the plaintiffs or the members of their class as these rights are guaranteed by the Constitution and laws of the United States. There is no justification, therefore, for this Court's issuing any injunction as to the defendant Philip Wood. As noted earlier, the evidence reflects that the defendant in counterclaim H. Rap Brown was not in Prattville or Autauga County on either June 11 or June 12, and the evidence does not reflect that Brown was ever in Prattville or Autauga County until June 13, at which time Brown merely made the press release hereinabove referred to. Such action and conduct on the part of Brown as is reflected by the evidence in this case will not warrant or justify the issuance of an injunction. An order will, therefore, be entered dismissing this action as to the defendant Philip Wood and as to the counterclaim defendant H. Rap Brown.

In accordance with the foregoing and for good cause, it is the order, judgment and decree of this Court that Kenneth Hill and Norris Champion, as police officers for the City of Prattville, Autauga County, Alabama, and O. C. Thompson, as chief of police for the City of Prattville, Autauga County, Alabama, their agents, officers, employees, successors, and all persons in active concert and participation with them be and each is hereby enjoined from:

(1) Inflicting summary punishment upon Negro citizens for the purpose of and having the effect of deterring said citizens from the exercise of their legal and constitutional rights;

(2) Unlawfully interfering, through the use of force and intimidation, with the peaceful and lawful assemblies of Negro citizens in Prattville, Autauga County, Alabama;

(3) Failing to guarantee to and give these plaintiffs and members of the class they represent proper and adequate police protection while said plaintiffs and members of this class are engaged in exercising their constitutional right to meet and assemble in a peaceful and orderly manner;

(4) Arresting Negro citizens upon pretense and subterfuge for the purpose

of deterring them from the exercise of their constitutional rights; and

(5) Allowing hostile white groups to gather and congregate for the purpose of committing acts of violence upon the plaintiffs and those similarly situated, or assaulting, threatening or intimidating them in the exercise of their constitutional rights, or otherwise impeding or interfering with the exercise of said rights.

It is further ordered that the plaintiffs (and defendants in counterclaim), Dan Houser and Sallie Hadnott, and the counterclaim defendants Student Nonviolent Coordinating Committee, an unincorporated association; Ulyssis Z. Nunnally, Will Henry Rogers, Charlie Levine, James Edward Harris, Santee Burnett, Doc Davis, and John Jackson, as agents of the Student Nonviolent Coordinating Committee; the Autauga County Voters Association, and the Autauga County Improvement Association, their agents, officers, employees, successors, and all persons in active concert and participation with them, be and each is hereby enjoined from:

(1) Sponsoring and arranging meetings and assemblies to be addressed by those who advocate violence through the use of weapons and other conduct designed to and tending to disrupt the peace and order of the community; and

(2) Using violent means to protest and demonstrate.

It is further ordered that this cause be and it is hereby dismissed as to Philip Wood and H. Rap Brown.

It is further ordered that the costs of this proceeding be and they are hereby taxed one-half against the plaintiffs and the defendants in counterclaim, and one-half against the defendants, for which execution may issue.

It is further ordered that jurisdiction of this cause be and the same is hereby expressly retained.

APPENDIX "A"
TESTIMONY OF NITRICIA HADNOTT

NITRICIA HADNOTT, witness for the Plaintiffs, having been duly sworn, testified as follows:

DIRECT EXAMINATION:

BY MR. SEAY:

Q State your name, please?

A Nitricia Hadnott.

Q Nitricia, I am going to ask you to speak up so these gentlemen over here can hear you?

A Nitricia Hadnott.

Q Where do you live?

A 626 Easy Street, Prattville, Alabama.

Q Is that in Autauga County?

A Yes; it is.

Q And how long have you lived in Autauga County?

A For fifteen years; sixteen.

Q Were you living at that address on June 11, 1967?

A Yes; I was.

Q What relationship, if any, are you to Mrs. Sallie Hadnott?

A She is my mother.

Q How old are you, Nitricia?

A Sixteen.

Q Did you attend a meeting of the Autauga County Improvement Association on June 11, 1967, in Prattville, Alabama?

A Yes; I did.

Q Where was that meeting held?

A It was held at the Autauga County office, but we moved it over to the First Baptist Church.

Q All right; is that church directly across the street from the office?

A Yes; it is.

Q Were you present there when some police officers arrived?

A Yes; I was.

Q  What had been going on prior to the time that these police officers came up?

A  Well, we was having a meeting, and Mr. Carmichael was speaking.

Q  All right; was the meeting orderly?

A  Yes; it was.

Q  All right; were you singing?

A  Yes.

Q  Was there any disturbance prior to the time that these police officers came up?

A  It wasn't before they came.

Q  The meeting was peaceful and orderly before they arrived?

A  Yes.

Q  What if anything happened when the police officers came up?

A  Well, when the police officers came up, Mr. Carmichael said, "Black Power," and so they went up the street and came back, and he said, "Black Power," again. And so they came out; three policemans was in the car.

Q  Do you know who the policemen were?

A  Two I know—well, one was Mr. Kenny Hill; the other was Norris Champion; the other I don't know his name, but I can identify him.

Q  All right. Was there a conversation at that time between either or all of the police officers and Stokely Carmichael?

A  Well, Mr. Carmichael went out to meet the policemen, and Mr. Hill told him, "Boy, you dont's go around hollering like this," and Mr. Carmichael told him that, "My name is Stokely Carmichael," so Mr. Hill said, "Well, I don't give a God damn who you are."

Q  Now, which Hill was this?

A  Kenneth Hill.

Q  All right. Did they place Mr. Carmichael under arrest at that time?

A  No; Mr. Carmichael asked them was he under arrest, but they said no, he wasn't.

Q  All right; what if anything did this —did Mr. Carmichael do at that time?

A  At that time, Mr. Carmichael came back to the meeting.

Q  All right. Then what happened? ·

A  So we were singing. And the policemen got on the radio and called for more police help. And at that time, Mr. Obie Thompson and Raymond Hill and Burton, they arrived, and Mr. Champion had something to say to Chief Obie Thompson, and they called Stokely back and told him that he was under arrest.

Q  Did they place him in a police car at that time?

A  Yes; Stokely was placed in a police car.

Q  Then what happened?

A  Then Mrs. Hadnott was talking to Mr. Champion, and she was telling him something, I just don't know what, but then she asked—he asked her had he done anything to her personally, and she said, "No, but when you do something to one of my black brothers, you have also done it to me," and Mr. Carmichael said, "Well, that's right, Baby," and so at this point, Raymond Hill went over to the police car and struck Mr. Carmichael.

Q  Where was Mr. Carmichael at the time?

A  He was in the police car.

Q  Was he seated in the car?

A  Seated in the back; yes; in the back of the car.

Q  All right; and was Mr. Hill inside the car or outside when he struck him?

A  Outside.

Q  Now, did you see Mr. Carmichael make any type of threatening gesture toward Mr. Hill before he was struck?

A  No; I didn't.

Q  Did he make any statement to Mr. Hill before he was struck?

A  No; he didn't.

Q Did you see him in any way attempt to strike Mr. Hill?

A No; I didn't.

Q Did you hear him say anything other than, "That's right, Baby"?

A No; I didn't.

Q All right. Now, did the police officers leave then?

A No; they stayed.

Q Now, did you go—scratch that. Do you know Jim Peppler?

A Yes; I do.

Q State for the record who you know him to be?

A I know him to be a photographer for the Southern Courier.

Q Was he present and taking pictures on this occasion?

A Yes; he was.

Q Did he have any conversation in your presence with any of the police officers of the City of Prattville?

A No; when he—when they was arresting Mr. Carmichael, he was trying to get up to get some pictures, and Raymond Hill—he had his camera around his neck, and Raymond Hill jerked his camera from around his neck and told him, "No more picture taking."

Q All right. Do you know Mr. Norman Lumpkin?

A Yes; I do.

Q Would you state who you know him to be?

A I know him to be the news man for W.R.M.A.

Q Was he there on this occasion?

A Yes; he was.

Q Did he have any conversation with—in your presence with any of the police officials of the City of Prattville?

A Well, he was trying to get a tape of what—what conversation was going on when they was arresting Mr. Carmichael. But Mr. Hill snatched his tape recorder from the tape.

Q Was that in your presence?

A Yes; I was right there.

Q Which Hill—Hill are you talking about?

A Raymond.

Q All right; did Mr. Hill say anything to—did Mr. Raymond Hill say anything to Mr. Norman Lumpkin at that time?

A He said we wasn't going to have no publicity.

Q Now, when the meeting moved up to Dan Houser's house, did you go with them?

A Yes; I did.

Q All right. Approximately how many people were up there at Dan's house?

A Well, I would say about seventy-five.

Q All right; now, what if anything was the group doing?

A Well, they was having a meeting.

Q Were they singing?

A No; they wasn't singing.

Q Talking or somebody speaking or just what were they doing?

A Yes; they were talking.

Q About how long did that meeting last?

A Well, it lasted until we heard the ambulance pass Mr. Houser's house, and about five minutes after then, shots came toward Mr. Houser's house, and we ran into the house and laid on the floor.

Q About how many people were in that house at that time?

A I would say about forty, something like that; I don't know.

Q Pretty well crowded?

A Yeah.

Q All right. Now, did you hear any other shots after you ran into the house?

A Yes; after we went into the house, it was still shots coming from the outside.

Q All right; could you tell or did you form any opinion as to whether or

not the shots were coming in the direction of the Houser house?

A Well, to me, it seemed like shots was coming from all directions toward Mr. Houser's house.

Q Were any shots fired from inside Mr. Houser's house during the time that you were in there?

A No. Not as I can recall of.

Q Were you inside the house at the time Mr. Houser received the phone call?

A Yes; I was.

Q Were you there when Mr. Houser left?

A Yes; I was there, but I—I don't know when Mr. Houser left.

Q All right. Were you there at the house when Sheriff Woods came up?

A Yes; I was.

Q What if anything did Sheriff Woods say when he arrived?

A When he arrived, he announced over the loudspeaker for Dan Houser to come out, that he would have his day in court, and he had so many National Guard, State Troopers, and the City Policemen, and for everybody in the house to come out with their hands up.

Q Now, did you come out?

A Yes; I did.

Q All right. Did everybody else in the house come out?

A Yes.

Q What happened when you came outside?

A When we came outside, well, they searched some of the cars, and they arrested some of the people, and the rest of us, they just got our name, and they told us that we could either go home or stay at Mr. Houser's house.

Q All right; what did you elect to do?

A I stayed at Mr. Houser's house.

Q Were there some—were there any other people who stayed at Mr. Houser's house with you?

A Yes; there was.

Q Approximately how many?

A Well, I would say about fifteen, something like that.

Q How long did you stay there?

A Well, I remained there until Mr. Houser called that morning for someone to come and get him.

Q All right; now, where did you go when you left?

A When I left—

Q Right?

A —Mr. Houser's house?

Q (Nodded to indicate affirmative reply)

A First, it was—he called for someone to come down to the City Hall to get him, so I went down to the City Hall.

Q Who went with you?

A Mr. Roosevelt Golson, Jr., and Mr. Mack Earl Deramus.

Q Where is Mr. Mack Earl Deramus right now?

A Well, right now, he is in the Job Corps, I think, in Indiana or Indianapolis or something like that.

A All right; now, what if anything happened when you got down to the Police Station to pick up Mr. Houser?

A Well, when we went in the Police Station, it was an officer in there, and he asked us to—

Q Do you know his name?

A His name was Davis.

Q All right.

THE COURT: What?

A I don't know his first name.

Q Davis?

A Davis. Well, he asked us to identify ourself, so I said, "Nitricia Hadnott," Mr. Golson stated his name, and Mack Earl stated his; so he asked us what did we come after, and I told him that Mr. Houser had phoned for someone to come get him, and we came to get Mr. Houser. So he said, "Wait a minute," and he went back in the office, I guess to make a phone call, and he came back out, and he

told us that, "When you get Mr. Houser, you better haul ass with him, because they are waiting up the street to kill him." And I asked him since he knew that they was waiting up the street to kill Mr. Houser, why couldn't he provide some protection since he escorted him down there, or some of his City Policemen, they escorted him down, and he told me that once Mr. Houser stepped out of the City Hall door, that he wasn't in their jurisdiction any more. And so I said, "Well, that is all right, we will go back and get some adult protection, because we don't have any, and you know that they are waiting up the street to kill Mr. Houser." And so he said, "Wait a minute"; he went back in the office, and he came back out, and he said that, "Well, you can go around on the side to see Mr. Houser," so we—as we was on—

Q   Did he ever—pardon me; did Mr. Davis, Officer Davis, ever tell you who they were?

A   No; he didn't say who they were, but I presume—

MR. PHELPS: Now, I—

MR. ROBISON: We object to that.

THE COURT: Just answer his question.

Q   He did not tell you who he meant by they?

A   No; he didn't.

Q   All right; did you thereafter see Mr, Houser?

A   Yes; when we went around on the side, we saw Mr. Houser standing in the door with two other officers. One was Danny Simmons; I can't call the other one's name. And Mr. Houser, at that time, his shirt was bloody, and his left eye was half closed, his face was swollen, and his nose—and looked like he had a cut or something on his nose.

Q   Did you have any conversation there with Mr. Houser in the presence of these two officers?

A   Well, the only thing that Mr. Houser said, while we was there, one of the officers—

MR. PHELPS: If the court please—

THE COURT: Just a minute.

MR. PHELPS: —we object to what was said.

THE COURT: Overrule; it is in the presence of some of the defendants.

MR. MOORE: What?

THE COURT: Go ahead.

Q   Go ahead.

MR. MOORE: The question—your honor, I don't think that the question was totally responsive—the answer was totally responsive to the question. The question was did she have any conversation in the presence of these police officers, and she didn't answer that; she just went into the conversation.

THE COURT: Well, I have ruled that she can answer the question.

MR. MOORE: All right.

THE COURT: That is the ruling of the court.

MR. MOORE: The ruling is she can't answer?

THE COURT: That she may answer.

MR. MOORE: Pardon me.

THE COURT: Go ahead, Mr. Seay.

Q   Did you have any conversation with Mr. Houser there in the presence of these—of any police officers?

A   The only thing that Mr. Houser said to us was that, "They want you to go around and bring your car around here on the side."

Q   All right. Now, did you then go to get the car?

A   Yes.

Q   What happened?

A   As we was going to get the car, one of the officers asked Mr.—the Golson what was he looking at, and Mr. —Mr. Golson said, "Well, we come to get Mr. Houser, so he say, "Go get

**934**

your car," and as we turned to go and get the car to bring it on the side, the officer said, "God damn nigger, when I tell you to do something, don't you stand up and look at me," and so he ran out and kicked Mr. Houser—I mean Mr. Golson, and so after he kicked Mr. Golson, then he went in the car and got something like a billy club and ran around on the front, running at Mr. Golson attempting to hit him with it.

Q All right; did you leave the Police Station then?

A Yes; I told Mr. Golson to leave the Police Station—

MR. ROBISON: We object, if the court please, to any conversation she had—

THE COURT: Sustained.

Q Where did you go after you left the Police Station?

A We went back up to Mr. Houser's house.

Q All right; how long did you remain there?

A Well, I remained there until up on in the day.

Q Did any officers come after—to Houser's house after you had gotten back from the Police Station?

A Yes.

Q Do you know the names of any of those officers?

A Well, Mr. Hill came in and—Kenneth Hill came in and said, "Everybody, every mother fucker or son-of-a-bitch that don't live here, get out and go home, because we are tired of this mess."

Q Which Hill said that?

A Yes; Kenneth Hill.

Q All right. Was there any disorder going on in the house at that time?

A No; it wasn't.

Q Was any kind of ruckus from the people inside the house?

A No.

Q And that is the first thing that Mr. Hill said when he came in the house? Did they search the house on this occasion?

A Well, I don't know, because I—I ran in the closet.

Q You ran in the closet?

A Yeah.

MR. SEAY: All right. I believe that's all; your witness.

THE COURT: Mr. Moore?

BY MR. MOORE:

Q Miss Hadnott, back at the church there on the Sunday afternoon, after Mr. Carmichael was arrested and taken away, did the police officers remain?

A Yes; they did.

Q All right; how many officers remained at the church?

A Well, it was Mr. Kenneth Hill, Mr. Raymond Hill, Obie Thompson, Chief Burton, and another one.

Q All right. What—what did they do as they remained there at the meeting?

A Well, they—they stood out there on the outside with their guns.

Q All right. Did they say anything?

A No—they didn't; Mr. Hill attempted to come into the office.

Q All right; can you describe to the court—strike that. Was this the office of the Autauga County Improvement Association?

A Yes; it was.

Q Across the street from the church?

A Yes.

Q Can you tell the court what Mr. Hill did when he tried to come into the office?

A Well, he said that he was coming into the office and run everybody out, and some of the citizens at the office, they blocked the door of the office, and he didn't go in.

Q All right; did he have a weapon at that time?

A Well, I don't know.

Q All right. Did you see the police officers do anything else out there while they stood around at the meeting?

A No; I didn't.

MR. MOORE: All right; no other questions.

APPENDIX "B"
COPY OF PRESS RELEASE
INTRODUCED INTO EVIDENCE AS DEFENDANTS' EXHIBIT NO. 1
AT HEARING CONDUCTED IN THIS CAUSE
OCTOBER 20, 23, 24, and 25, 1967.

STUDENT NONVIOLENT COORDINATING COMMITTEE

360 Nelson St. S. W.
FOR IMMEDIATE RELEASE:        Atlanta, Georgia 30313
June 13, 1967                 Phone: 404 688 0331

---

STATEMENT BY H. RAP BROWN, SNCC CHAIRMAN, ON PRATTVILLE, ALABAMA SITUATION

Gentlemen: I have called this conference to clarify the position of SNCC on the developments in Prattville, Alabama, Autauga County. The facts of the case, which either have not been widely reported or distorted, are as follows:

On Sunday, June 11, Stokely Carmichael, former SNCC Chairman, was arrested by Kenny Hill on a charge of disorderly conduct, after Mr. Carmichael had called out the slogan "Black Power" to some friends gathered at a meeting. The police, who had been patrolling the area, were apparently trying to stalk Mr. Carmichael with the hope of arresting him and provoking a disturbance. A crowd of friends and co-workers gathered and exchanged words with the police in their efforts to determine the charges being levied against Mr. Carmichael. Police attacked one news reporter and damaged the [e]quipment of Norman Lumpkin from Radio Station WRMA in Montgomery. Shortly thereafter, white klansmen riding down the main street began shooting from their cars; when black men returned the fire, the shooting stopped. Later on that evening, crowds of klansmen, accompanied by the police, entered houses in the black community, interrogating the occupants, beating and sending home those persons who were not in their own houses, and forcibly sending persons who did not live in Prattville to the highways. A mob of several whites, including klansmen and police, surrounded the residence of Mr. Dan Houser, NAACP leader in Prattville, trapping some 25 black people, mostly women and children, inside. When the people refused to come out, the crowd began shooting into the house and shot out all street lights in the area amidst shots and screams. Finding themselves in a critical situation and their lives in danger, a few black men began returning fire, which is believed to have resulted in the wounding of five policemen.

Eventually the mob entered the house, ordered the occupants outside and held several persons for almost an hour in front of the house with arms raised. After people were questioned through the use of beatings and physical intimidation, the following nine persons were arrested: Stanley Wise, Uzee Nunnery, Theophilus Smith, Julius Roberts, Rev. James Harris, Haber Willis, Charlie Devine, Nathaniel Rudolph, and Horace Morris.

The black community of Prattville was concerned for the safety of the arrested men because Charles Rasberry, a black man, was murdered in the same Prattville jail in February by the same policemen who arrested Carmichael. We in SNCC became further concerned when we received inquiries from members of the press investigating a report that Carmichael had been killed. Our concern was heightened by the fact that all of the jailed men have been kept incommunicado by Prattville authorities, and we were unable to get any reliable news of their physical condition or treatment. Mr. Houser was severely beaten by police, chased out of town, is now in the St. Jude Hospital in Montgomery, and is in danger of losing sight in one of his eyes. Mr. John Hulett of the Lowndes County Freedom Organization was beaten and chased out of town.

We know that this entire incident was the result of deliberate and provocative violence on the part of the Prattville police, along with their brothers in the Ku Klux Klan. If this present breakdown of law and police lawlessness continues, the black community will be forced to take defensive measures and retaliate. Total violence will be the result. For that reason, we have called upon the Attorney General of the United States to act immediately. Mr. Ramsay Clarke was sent the following telegram:

We direct your attention to the lawless and criminal invasion of the Negro community by Prattville, Alabama police and klansmen. We charge that civil and legal rights of several Negroes were violated. We can document several instances. Ten Negroes being held incommunicado in Prattville jail, where in recent months at least one Negro has been murdered by police. We urge that you investigate conduct of police, act immediately to protect rights of Negro population and to prosecute police officers guilty of violence against innocent people in their homes. Failure of federal government to act to ensure justice will encourage violence by white racists, and leave Negro community no alternative but self defense. Responsibility for peace in months to come rests with your Department. Request that you inform us of action you take. Documented letter to follow.

H. Rap Brown
Chairman, SNCC

We have also called upon the major civil rights organizations to unite in the defense of the black community in Prattville. The text of the telegram sent to these organizations is available.

We profoundly hope that a complete and impartial investigation of these incidents will be made by the Justice Department, and that appropriate charges will be brought against the klansmen and police responsible for the violence. We demand that Atty. General Clarke take this action. Unless this is done, the black community of Prattville, as well as blacks throughout the South, will know that their rights will not be protected by the legal structures of this country and will move to protect their rights by any means necessary.

The responsibility for what happens this summer in the South rests, in large measure, upon whatever positive action the Federal Government takes in this situation. Lyndon Baines Johnson has a bill before Congress concerning "Crime in the Streets" which is directed against America's black communities. We in SNCC would strongly suggest that L.B.J. should be personally concerned with directing his attention to the lawless whites of Autauga County—since his wife, Lady Bird, owns one of the largest plantations in that county.

APPENDIX "C"

COPY OF NOTES OF SANDRA COLVIN

INTRODUCED INTO EVIDENCE AS DEFENDANTS' EXHIBIT

NO. 2

AT HEARING CONDUCTED IN THIS CAUSE

OCTOBER 20, 23, 24, and 25, 1967.

Conversation Between Hill & Carmichael

(Stokely Carmichael's Arrest)

Stokely Carmichael (speaking to crowd): We advocate that all black people get some guns and learn to use them. The only way to get Kennedy Hill off force is to organize the black power in this area and use your guns. (Troopers drive by.) Black Power! (The troopers are 3 in one car. The driver passes, turns around drives by again) Black Power! (The driver of the car reversed the car.) Black Power!

Kennedy Hill — (Pointing his finger at Carmichael as he hop[p]ed out the car.) Listen you. You don't go 'round shouting and going on, hear?

Carmichael — Would you like to speak to me? I'm Mr. Carmichael.

K. Hill — I don't give a damn who you are! You've got no business shouting like that.

Carmichael (to crowd) — You know, the only time black people are allowed to meet without interference is to pray and to dance. Whenever black people get together for any other reasons, the hunkies get scared and come out to beat and kill us.

K. Hill — Shut up, boy cause I'm the law around here.

Carmichael — Take off that tin badge and drop your gun. I'll show you something, hunkie.

Hill — You're threatening me.

Carmichael — Do you want to arrest me?

Hill — No, we don't want to arrest you. Our job is to protect the people.

Carmichael — Just drop your tin badge & that gun, hunkie. (Then to crowd) These hunkies want to send us to Vietnam to fight the Viet Cong and then they get all the credit. Our war is right here in the United States of America, black people!

(More policemen came. One of first policemen radioed for more)

Carmichael: From now on, its going to be an eye for an eye, a toot[h] for a toot[h], and a hunkie for every black man killed!

Hill: You're under arrest!