302 F.Supp. 1383 (1969)
Charles KOEN, Percy Green, Richard P. Koch and Joel Allen
v.
Isaac A. LONG et al.
No. 68 C 429(1).
United States District Court E. D. Missouri, E. D.
August 4, 1969.
*1384 *1385 *1386 Robert B. Curtis, and Samuel H. Liberman, St. Louis, Mo., for plaintiffs.
Lashly, Caruthers, Rava, Hyndman & Rutherford, Murphy & Schlapprezzi, St. Louis, Mo., and James I. Bucher, Asst. Prosecuting Atty., City of St. Louis, St. Louis, Mo., for defendants.

MEMORANDUM OPINION AND ORDER
HARPER, Chief Judge.
The plaintiffs herein have instituted this action seeking certain injunctive and declaratory relief against an alleged scheme, plan or conspiracy to deprive them and members of their class of their civil rights under color of law, and in addition attack the constitutionality of three ordinances of the City of St. Louis. Jurisdiction is based upon the provisions of 28 U.S.C.A. § 1343. The action is maintained under 42 U.S.C.A. §§ 1981, 1983 and 1985.
Plaintiff, Charles Koen, was at the time of this litigation "Prime Minister" of a voluntary association of Negro-Americans known as the "Black Liberators". The complaint describes the organization as one with a "militant outlook". Plaintiff, Percy Green, is and at all relevant times has been the chairman of ACTION, a voluntary association of both whites and Negroes whose stated primary purpose according to the complaint has been the economic improvement of members of the Negro race primarily through the elimination of racial discrimination in hiring and employment practices, although the evidence presented at the trial of this matter indicates it is a militant group sponsoring and participating in purported civil rights activities far beyond the pleaded purpose. Plaintiff, Richard P. Koch, is a member of a loose-knit organization commonly *1387 known as Students for a Democratic Society (SDS), and holds the office of "Coordinator" within the membership of the Washington University chapter of that organization. From the pleadings and evidence it is not entirely clear as to what the precise outlook or aims of that chapter of SDS are. Plaintiff, Joel Allen, was at the time of filing a member and officer of an organization called McCarthy for President, and at the same time was a member of SDS.
These four individuals sue in their own behalf and "pursuant to Rule 23 of the Federal Rules of Civil Procedure as a class action, on behalf of other citizens who, like plaintiffs, belong to organizations which it is alleged are unpopular with defendants, and who have participated and wish to continue participating by speech and conduct in activities which are controversial and unpopular with defendants but nevertheless lawful * * *."
The defendants, Long, Harrison, Walsh, Gates, Cervantes, Sanders and Rogers, constitute the past and present Board of Police Commissioners of the City of St. Louis, and under the provisions of § 84.010 et seq., RSMo 1959, V. A.M.S. are charged with governing the police department of the City of St. Louis. Defendant, Curtis Bronstrom, is the Chief of Police of the City of St. Louis. Defendant, Fredrick J. Grimes, is a lieutenant in said police force, presently stationed in the Ninth District of the City of St. Louis. Defendant, Thomas Shannon, is the prosecuting attorney for the City of St. Louis, and in such capacity is charged with the duty and power to prosecute violations of state misdemeanor statutes which occur within the city, § 56.490 and § 479.100 RSMo 1959, V.A.M.S. Defendant, Gary Gaertner, is the city counselor for the city, and under the ordinances and charter thereof is responsible for the prosecution of violations of the ordinances of the city. Defendant, George W. Cady, is a judge of the City Court of St. Louis, presently presiding in Court No. 1. Defendant, Richard Brown, is a judge of the Court of Criminal Corrections which has jurisdiction involving state misdemeanors and is the appellate court for appeals from judgments of the City Courts.
The essence of the complaint with respect to injunctive relief is found in the fourth paragraph. That paragraph with its sub-parts charges a concerted and conspiratorial plan and scheme to deprive plaintiffs of certain specified rights as follows:
"Defendants, * * * and others with whom they have acted in concert and conspired, have deprived, and unless enjoined by this court will continue to deprive, plaintiffs * * * of their constitutionally guaranteed rights to * * * and engage in other lawful activity which is unpopular with defendants. This deprivation has been accomplished in the course of a deliberate, concerted and continuing harassment under color of law including the following actions:
"a. * * *
"b. * * *."
Following said allegations and specific examples of the activities involved, in paragraphs 6 and 7 the plaintiffs allege certain agency relationship and again urge conspiracy with the existence of a pattern and practice designed to intimidate and harass.
The second thrust of the complaint deals with the alleged unconstitutionality of three ordinances of the City: § 762.030, Public Disturbance of the Peace; § 763.010, Unlawful Assembly; and § 765.010, Loitering.
Finally, plaintiffs allege irreparable injury and the lack of an adequate remedy at law, seeking to thus invoke federal equitable and declaratory powers.
A hearing on the requested preliminary injunction was held on October 18, 1968, and was continued on the 21st and 22nd of that month, and after receiving evidence there presented and upon oral argument of counsel, this court in an oral opinion refused to issue the preliminary injunction. On March 3, 1969, the *1388 final hearing on the permanent injunction and upon the merits of the declaratory relief was held and additional evidence was adduced. Upon request of parties time was granted within which to file briefs, which both sides have done.
The evidence presented by the plaintiffs was as broad as their complaint. It consisted basically of testimony concerning 17 arrests over a three-year period, 1966 to March, 1969; 4 other incidents; police search practices and other forms of alleged intimidation; and the procedures employed in City Court No. 1. The evidence lends itself to a breakdown into three major categories: Arrests and claimed police search practices together with other claimed illegal harassing actions; procedures and conduct at and before trials in City Court No. 1; and plaintiffs' attack on the three ordinances heretofore mentioned.
Before considering the evidence presented in these areas generally, several preliminary matters are raised by the defendants. First, all of the defendants, jointly, attack the maintenance of this suit as a proper class action under Rule 23, Federal Rules of Civil Procedure. Rule 23, insofar as applicable, provides:
"(A) One or more members of a class may sue * * * on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims * * * of the representative parties are typical of the claims * * of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."
As stated by the Advisory Committee, one of the purposes of the 1966 amendments of this rule was to enable the institution of a class action "where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration." 28 U.S.C.A. Rule 23, 1967 Supp. Of course, the elimination of the pre-existing three types of categories also was designed to clearly place all class actions within the purview of the rules of res judicata.
In support of the propriety of the class action as alleged, plaintiffs cite many cases: Lankford v. Schmidt, D.C., 240 F.Supp. 550, aff'd 4 Cir., 364 F.2d 197; Green v. Department of Public Welfare, etc., D.C., 270 F.Supp. 173; Cypress v. Newport News General Hospital Association, 4 Cir., 375 F.2d 648. In each of these cases the allowed class was both large and to a certain extent indefinite and incapable of specific enumeration. However, in each of these cases it was perfectly clear what the membership of the class was, and certainly the class involved did not depend on the state of mind of the particular individual.
In Chaffee v. Johnson, D.C., 229 F. Supp. 445, aff'd 5 Cir., 352 F.2d 514, cert. den. 384 U.S. 956, 86 S.Ct. 1582, 16 L.Ed.2d 553, the court stated:
"* * * The complaint described the alleged class as all persons who are workers for the end of discrimination and segregation in Mississippi, for the encouragement of the exercise by Negroes in Mississippi of their right to vote and to register to vote, and for the exercise and preservation of civil rights generally in Mississippi. Clearly this is not a proper class action. The vague and indefinite description of the purported class depends upon the state of mind of a particular individual, rendering it difficult, if not impossible, to determine whether any given individual is within or without the alleged class. The members of a class must be capable of definite identification as being either in or out of it."
The deficiency here urged by the defendants is precisely this one stated in Chaffee. Such a defect is even more pronounced here where membership in the class is dependent both upon the state of mind of the particular individual involved and upon the state of mind *1389 of the particular defendant involved in a situation in which it is perfectly apparent that the defendant's individual opinions as to any given organization may differ.
In the opinion of the court nothing in the 1966 amendments to Rule 23 was designed to allow the inclusion of the type of class here described. With the clear applicability of res judicata to all class actions, the ability to identify any given person as a member of the class takes on an even greater importance. Therefore, this court is of the opinion that the action cannot be maintained as a class action with the class remaining as described. See also, Giordano v. Radio Corporation of America, 3 Cir., 183 F.2d 558.
This does not mean, however, that the action itself cannot be maintained as a class action, but rather that the class description must fail. A proper class was shown to exist under the evidence presented at the trial. Such a class consists of the members of ACTION, represented by Percy Green; the members of the Black Liberators, represented by Charles Koen; the members of SDS, represented by Terry Koch and Joel Allen; and the Zulu 1200's, based upon testimony of some of its members. The court finds that a class so constituted clearly exists and under the evidence present a class so constituted would specifically qualify under the express provisions of Rule 23.
It will, therefore, be ordered that the class action described in the complaint be dismissed as an improperly described class, and that in conformance with Rule 15(b) that the pleadings be conformed to the evidence presented, the pleadings are hereby ordered conformed to describe the class action as found to exist by the court from the clear evidence presented.
Second, the defendants, Cady, Brown, Shannon and Gaertner, urge that by virtue of their respective positions as judges and prosecuting attorneys they are totally immune from all suits under the civil rights act, section 1981 et seq. In so raising this defense, they rely on the Supreme Court's decision of Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288, and other similar cases. See, e. g., Bauers v. Heisel, 3 Cir., 361 F.2d 581, cert. den. 386 U.S. 1021, 87 S. Ct. 1367, 18 L.Ed.2d 457.
Of course, such a proposition would be obviously applicable if the plaintiffs sought damages in this action. Here, however, plaintiffs have asserted the inadequacy of the remedy at law and seek injunctive and declaratory relief. Defendants cite no case in which the common law doctrine of judicial immunity, as discussed in Pierson, has been extended to suits requesting purely equitable relief. Indeed, the very rationale of the Pierson decision stands against them. Indeed, in the history of the common law, judges and other quasi-judicial officers have been held subject to equitable and quasi-equitable actions  for example, writs of mandamus and prohibition.
In the opinion of the court the rationale of Pierson does not extend to cover the case at hand. The case law supports this proposition, see, e. g., Smith v. Hill, D.C., 285 F.Supp. 556. Indeed, just three weeks after the final hearing on this matter, the Supreme Court in Hadnott v. Amos, 394 U.S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336, issued a temporary restraining order against a state court judge, and on final hearing reversed the district court's refusal to grant a permanent one. Under the necessary rationale of Hadnott, the defense here urged must fail. See also, Ex parte Virginia, 100 U.S. 339, 25 L.Ed. 676 (1880).
Before proceeding to the bulk of the cause the court will first examine the evidence relating to the defendants Shannon and Brown. A careful examination of the whole record before the court reveals a sum total of evidence dealing with Judge Brown of near zero. His very name was mentioned only once or twice. There is absolutely no evidence *1390 in the record at all which would place this defendant within the purview of this complaint. In short, there is a total failure of proof on the allegations of the complaint. Indeed, some of the evidence that does exist points to the fact that Judge Brown reversed, on appeal, convictions which form part of the complaint directed against Judge Cady.
It will, therefore, be ordered and decreed that the motion to dismiss renewed by the Honorable Richard Brown at the close of the testimony in the case and upon which the court reserved ruling, is sustained, and this cause of action is dismissed as to defendant, the Honorable Richard Brown, at plaintiffs' costs.
The evidence relevant to the defendant Shannon has a somewhat greater volume but similar content. In subject content it is limited to participation in two events described and complained of over the three years herein involved. First, on the evening of September 7, 1968, a rally was held at Sheldon Memorial in the city. On that evening following certain inflammatory speeches (Plaintiffs' Ex. 19 contains police officers' description of those speeches), Chief Bronstron conferred with Shannon by telephone (Bronstron Depo. pp. 21-27). After receiving information, Shannon by telephone authorized the issuance of seven warrants (Plaintiffs' Exhibit 32b) charging violations of § 562.160 RSMo 1959, V.A.M.S. These state warrants were issued and executed concurrently with city warrants charging violations of § 763.010 Revised Code of the City of St. Louis. The next day, however, upon receipt of further information, Shannon refused to in fact issue four of the warrants for the reason of insufficient evidence (Plaintiffs' Exhibit 32a). Warrants were issued for Koen, Hutchins and Dent. An information was filed and the case went to trial in the Court of Criminal Corrections, resulting in an acquittal.
Second, on December 18, 1966 (Tr. 315-17), Percy Green was arrested on the charge of assaulting a police officer (among others). Such offense is a felony under § 557.215 RSMo, and as such was without the jurisdiction of the defendant. The Circuit Attorney (not a defendant herein) presented the matter to the Grand Jury, which returned an indictment for common assault, a misdemeanor, § 559.220 RSMo. Then in accordance with the law the Circuit Court certified the indictment to the Court of Criminal Corrections, at which time Shannon became involved. Of course, by this time the matter had already been considered by one prosecuting official and by the Grand Jury which had found probable cause. Shannon tried Green and an acquittal resulted.
This is the sum and substance of the evidence relating to Shannon for the three-year period. It is clearly insufficient to make a case under the allegations of the complaint. No evidence of participation in any plan or scheme or action exists. In view of the Grand Jury indictment and the certification in the second incident, the prosecution was obviously undertaken in good faith. Only the first described incident is relevant to the plaintiffs' charges. Rather than show bad faith, his actions prima facie demonstrate the contrary. Good faith enforcement is presumed and the force of that presumption is great. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22; Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L. Ed.2d 444; Cameron v. Johnson, 390 U. S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182. The burden is upon the plaintiffs to overcome this presumption, and upon the record here they have failed to do this.
It will, therefore, be ordered and decreed that the motion to dismiss renewed by Thomas Shannon at the close of the testimony in the case, and upon which the court reserved ruling, is sustained, and this cause of action is dismissed as to defendant, Thomas Shannon, at plaintiffs' costs.
The court now proceeds to the various sub-parts of the controversy.

*1391 I. Procedures and Conduct at, before and after trial in City Court No. 1, Judge G. Cady presiding.

The first area of attack within this category is the bail practice and procedure used. Bail in the city courts here is governed by the Missouri Rules of Procedure, Rule 37.01 et seq., V.A.M.R.
Rule 37.15 governs admission to bail and in accordance with the Missouri Constitution, Art. 1, § 21, V.A.M.S., provides that the judge, clerk or any peace officer "when authorized by law" shall admit the accused to bail. The words "peace officer" are defined so as to include police officers and marshals, Rule 37.05, but it is clear that the judge retains the ultimate authority.
However, the whole bail procedure may be by-passed under Rule 37.09 which provides for the issuance of a summons instead of a warrant "if the judge or prosecutor has good reason to believe that the accused will appear in response thereto." Further, in any case where "it is lawful for an officer to arrest a person without a warrant, he may serve such person with a summons instead of arresting the accused."
In traffic cases, Rule 37.46 provides for the exclusive use of the Uniform Traffic Ticket (see Rule 37.1163 for the form thereof). This ticket incorporates the summons device instead of the arrest procedure. However, under Rule 37.46 it is clear that a more detailed information may be filed and hence by reference the arrest-bail procedure is available.
In Pilkinton v. Circuit Court of Howell County, Missouri, 324 F.2d 45, 46 (8th Cir. 1963) the court stated:
"* * * contrary to earlier cases * * *, the prohibition in the Eighth Amendment against requiring excessive bail must now be regarded as applying to the States, under the Fourteenth Amendment."
Plaintiffs ask this court to hold unconstitutional the practice of requiring bail from persons charged with violating city ordinances, but who have no history of non-appearance. It is their contention that the evidence establishes that bail is being used as a means of non-judicial punishment, thus depriving those arrested of due process and equal protection of the laws.
First, it is clear that the prohibition involved in the constitution is merely against excessive bail. No court has yet held that the Eighth Amendment or any other affords a basis for claiming a constitutional right to be released in any given situation without bail or on one's own recognizance. See, e.g., Pilkinton, supra; Mastrian v. Hedman, 8 Cir., 326 F.2d 708, cert. den. 376 U.S. 965, 84 S.Ct. 1128, 11 L.Ed.2d 982.
It is also clear that bail is not excessive merely because the defendant is unable to pay it or because the cost of obtaining same is high. See e.g. Hodgdon v. United States, 8 Cir., 365 F.2d 679, cert. den. 385 U.S. 1029, 87 S.Ct. 759, 17 L.Ed.2d 676; New York v. Hutchinson, 2 Cir., 360 F.2d 759.
Bail and the amount thereof are, of course, susceptible to misuse. Where as here an alternate non-bail procedure is available, misuse by selective employment is quite possible. Bail has only one legal purpose, insuring the defendant's presence at trial. Bandy v. United States, 364 U.S. 477, 81 S.Ct. 244, 7 L.Ed.2d 850; Stack v. Boyle, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3. It must, therefore, be set in amount at a level calculated to assure the presence and this amount must of necessity turn upon the facts and circumstances present in the case. See e.g., Stack v. Boyle, supra; United States v. Weiss, 7 Cir., 233 F.2d 463; Forest v. United States, 8 Cir., 203 F.2d 83; United States ex rel. Rubinstein v. Mulcahy, 2 Cir., 155 F.2d 1002.
Under the evidence present as to the setting of bail, there is no basis in fact for a determination that there has been a denial of due process or equal protection, nor a general violation of the Eighth Amendment in relation to plaintiffs and their class. Much testimony *1392 was forthcoming as to the amount of bail set in the various cases discussed and of the general failure of the court, the police and the marshal to use the alternate summons procedure. But none of the credible evidence points to any of the circumstances surrounding the setting of the bail amount in relation to the need to assure presence at trial. In view of the present state of the law that recognizance is not required even with a history of no non-appearance, more must be shown than relatively high bail figures. Except for the one occasion of the Centennial Church demonstration of December 8, 1967, there is no evidence to demonstrate the number of times in similar situations in which the alternate summons procedure is used or not used so as to create any evidence of selective discriminatory employment of either procedure.
It is clearly not the function of this court to enforce the rules of the Supreme Court of Missouri. The writs of mandamus and prohibition, and here habeas corpus, are available within that system to quickly and efficiently enforce and police the applicable rules regarding bail. Bail being totally dependent upon the individual circumstances of a case is not an area in which general declarations are possible. An injunction by this court would serve only one purpose and that would be the impermissible substitution of this court as the arbitrator of all future bail disputes in city court. Under the evidence here presented, giving an insufficient picture of the circumstances governing bail, an intrusion into the city and state judicial systems would be both unwarranted and intolerable.
The second area of attack is the procedure employed before and during the trial of a cause in City Court No. 1. Two witnesses, Messrs. Gutherie and Hopper, and Judge Cady's deposition form the evidentiary basis for this statement.
Mr. Gutherie, commander of the Zulu 1200's, was arrested on one evening and taken to the local district station. Being unable to make bond, he was held over. The very next morning he was transferred to Central Headquarters and then taken to the cell behind City Court No. 1. The docket was called and then Gutherie was brought into the court room. The charge was read to him by the clerk. No one informed him of any right to counsel, to obtain a continuance for the purpose of obtaining an attorney, or to prepare for his defense. He entered a plea of not guilty and the city put on its case. At its conclusion, the prosecutor told him that it was not necessary that he take the stand and testify.
Mr. Hopper, who was arrested at the Chase-Park Plaza on the occasion of a speech of Clark Clifford, then Secretary of Defense, did make bail and after several city-obtained continuances, was brought to trial. He was represented by an employed attorney. A demand was made for a jury trial  as allowed by Missouri Rule 37.54 and by § 175.000 Revised Code of the City of St. Louis  but said demand was refused.
Judge Cady testified that (1) no written court rules exists (a prima facie violation of Missouri Rule 37.03); (2) that he is guided by the City Ordinances in the conduct of his court (but § 172.010 et seq. governing city court operations cannot be said to contain any procedural guides); (3) that no set procedure exists by which accused persons, not already represented by counsel, are advised of any of the basic procedural rights which are theirs, such as the ability to make bond, continuance, change of venue, fifth amendment privileges, etc.; (4) that usually the marshal or the prosecutor does tell the defendant about these items, although on occasion he himself did. Now it is clear that many defendants in Judge Cady's court in fact do exercise all of these rights all the time. But at best the approach in City Court No. 1 to basic procedural fairness is slipshod.
The state of the applicable constitutional law now existing is such that very *1393 little due process is carried down to the level of the city police court. Absent a work-off fine provision, the length of sentence which can be imposed is too short to constitutionally require a jury trial as a "serious offense" ($500 and 90 days as the maximum punishment). Nor is the appointment of counsel a necessity on this level. In fact, a laissez-faire approach to the dispensation of justice still exists in the police courts. While such an outlook is distasteful, sheer volume may require its continuance. This court is not disposed upon the evidence presented in this record to alter such a system as here exists, nor will this court under the evidence here presented interpose itself.
The testimony shows no greater injury to an accused than is normally concomitant with the criminal judicial process. Thus no irreparable injury has been shown. Dombrowski, supra, 380 U.S. at 485, 85 S.Ct. 1116. Certainly, once again the state and not the federal judiciary is the appropriate agency to enforce state rules (which would obviate the constitutional challenges urged), absent clear and convincing evidence of a clear and immediate danger of irreparable injury. See, Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113.
The third area of controversy in relation to the city courts deals with appeals and appeal bonds. What has heretofore been stated in relation to bail in general is equally applicable here. Although it does seem to be inflexible, the policy announced in relation to appeal bonds does not under the evidence warrant intervention.
However, the appeal procedure requires greater investigation. Here again the evidence demonstrates that the marshal usually informs the defendant of the appeal procedure and procures the necessary forms. In this case, it is rather clear that the court has the clear duty to carefully inform each convicted defendant of the precise appeal rights present, or else to provide him with a written description of those rights. Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811.
Appeals from the city police court are taken to the Court of Criminal Corrections, § 479.110 RSMo. That section provides for the use of the procedures set forth in § 543.290, which requires an affidavit of appeal (see Rule 37.1171 for the form), and then requires, within ten days, perfection of said appeal, including the payment of a two-dollar transcript fee. But § 479.110 adds a further requirement, as it states: "* * * except that the application for appeal shall be filed immediately after judgment." This precise wording has never been interpreted by an appellate court in this state. In 1882, operating under a similar but different statute, in City of St. Louis v. Kneper, 11 Mo.App. 587, an appellate court in a memorandum opinion required a same-day filing of the application. However, since the laws of 1873 several changes have been made in this statute. The result is that in spite of the time passage, an unwritten practice has developed which requires the filing of the application the same day as the conviction  to use Judge Cady's words, "before sunset or the close of court."
While such a practice if strictly followed would perhaps be subject to criticism, there is no evidence that it has been strictly enforced. There is no evidence an appeal sought to be taken at a later time was denied.
The final area of controversy within this subject area deals with two facets of the court's operation: (1) Purported convictions without evidence to support them, and (2) sentences (fines) allegedly "grossly disproportionate to the sentences imposed upon others for the same or similar offenses."
Of course, a criminal or quasi-criminal conviction devoid of evidentiary support is violative of due process. Thompson v. City of Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654; Gregory v. City of Chicago, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134. In such a situation, correction of that deprivation is *1394 readily available in the appellate processes of the state, especially where as here, the appeal results in a trial de novo. Contrary to plaintiffs' rather fanciful interpretation of the evidence, it is not implicit that any totally innocent person has been convicted by Judge Cady in a devoid-of-evidence situation. From the credible evidence presented, the most that can be said is that Judge Cady generally believed the police officers, while often on appeal in the Court of Criminal Corrections the jury did not. Certainly nothing here warrants intervention. If this court could on the record here intervene, then in all arguably invalid conviction situations, the federal courts could be forced to become the appellate courts for the state. See, Douglas v. City of Jeanette, 319 U.S. 157, 164, 63 S.Ct. 877, 87 L.Ed. 1324.
The plaintiffs attack Judge Cady's sentencing. Plaintiffs' Exhibit 16 is a chart showing all of the convictions (on the relevant charges) in Judge Cady's court for the period July through September, 1968. It shows the fines imposed, the amount stayed, the net fine and jail time. It does not identify the offenders other than by name; it does not describe the conduct which resulted in conviction; it does not show any racial distinction nor any membership or lack thereof; it does not differentiate between conviction and pleas; and most importantly, it fails to reflect prior record or the lack thereof. One thing it rather clearly shows: All of the fines imposed within this period were within the limits set by the ordinances of the city and that, therefore, each fine was presumptively legal.
Much like the bail situation, the sentence imposed by a judge depends upon the peculiar facts and circumstances surrounding the individual case and the individual defendant himself. Imposition of sentence reposes in the sound exercise of judicial discretion, governed by the limits imposed by the relevant ordinance. If the sentence imposed is within this limit and jurisdiction otherwise exists, it is a legally permissible sentence even though it may well be harsh.
In the opinion of the court, to even warrant considering this charge the plaintiffs are required to demonstrate that the sentences imposed are in fact disproportionate, which they have failed to do; and further, that the difference is the result of a constitutionally void motive, bias or prejudice by the judge. Because of the obvious deficiencies in the chart (Exhibit 16) and the resulting averages therefrom, there is a total failure of proof on the initial element. Further, the sole evidence of motive is found in Judge Cady's deposition, wherein he testified that he is in sympathy with civil rights leaders and activities (p. 29) and that he does not distinguish between defendants upon the basis of label, militants, etc. (p. 28). Further, it should be noted that no irreparable injury is possible here due to the fact that plaintiffs can always utilize the devices of a change of venue and a disqualification of the judge to avoid Judge Cady. Plaintiffs' contentions here are totally without merit.

II. Police Practices and Prosecutions.

This broad area encompasses the majority in number of the plaintiffs' complaints and the basis of their attempt to demonstrate the existence of the conspiracy and plan or scheme of concerted action alleged in the complaint. (par. 467).
Of the 31 witnesses who testified, most were concerned with this area of controversy. In dealing with this area it must be remembered that by and large the objectivity of the witnesses lacked any objectivity, and furthermore, a great deal of their combined testimony was based upon hearsay and otherwise generally not overly reliable.
In turning to the testimony itself we first look at the testimony insofar as the four plaintiffs in this action are concerned.
While there is repeated reference in the testimony to the plaintiff, Charles *1395 Koen (the Prime Minister of the Black Liberators) and his activities, he did not testify.
The testimony of the plaintiff, Percy Green (Chairman of ACTION), disclosed that he was arrested on December 18, 1966, charged with assault on a police officer, resisting arrest of a traffic violation, and peace disturbance. The arrest arose out of an alleged traffic violation. He was tried in this case, convicted, appealed, and after the appeal, was tried in the next higher court and acquitted.
On June 7, 1967, he was arrested for interfering with a police officer and peace disturbance, was tried, convicted, appealed, and then pled guilty. In the fall of 1968, he was arrested as a result of activities at Kiel Auditorium at the time of the Veiled Prophet Ball, charged with failure to obey a reasonable police order. This charge was set for trial after his testimony in the present case.
Green's testimony discloses that he has been very active in organizing and participating in demonstrations in the City of St. Louis. The testimony indicates that when these demonstrations were planned, the news media was immediately called and were usually present. Testimony further discloses that the police were present, and although he participated in many, many demonstrations he was only arrested three times in the three-year period; that he pled guilty to one of the charges, was acquitted as to one, and the third is still pending. The testimony with respect to his arrest that occurred within the last year at Kiel Auditorium disclosed that Green and his ACTION guerrilla force went to Kiel Auditorium to demonstrate at the Veiled Prophet Ball; that they were told by the police that they could do their picketing on the opposite side of the street from the entrance, which they did for some time, and nothing occurred. According to one of the witnesses, Franklin Leming, Jr., a reporter of the Post-Dispatch, the Negro Veiled Prophet, his queen, and Reverend Witte, crossed the street and went to the door and sought admission to this private party. Admission was denied. They went back across the street, where they remained for some time, and then at about 8:10 p. m., when the street in front of the entrance was crowded with people going in, they, including Green, went back across the street and were told by Chapman, one of the police officers, to go back across the street to do their picketing, which they did not do, but proceeded to start an argument, and they were arrested. The testimony discloses that Green and his group, the ACTION guerrillas, have picketed many openings such as that of the Powell Symphony Hall and other events, without incident, the police always being present, and it was only after disturbances, often violent in nature, with respect to the picketing that in rare instances arrests were made.
One need but have listened to the testimony of Green to come to the conclusion that his attitude was one of belligerency, seeking to create strife, turmoil and trouble, rather than peaceful picketing.
The third plaintiff, Richard R. Koch, the Coordinator for SDS, had participated in at least fifty demonstrations in St. Louis in the last three years, and had been arrested twice, once for loitering, in December of 1967, which was dismissed, and which arose out of picketing at the Chase Hotel where Vice President Humphrey was speaking. The other arrest was in December of 1966, when he and a group were demonstrating in front of the president of the police board's house and were taken to the station, but he was released without bond and nothing further occurred.
The fourth plaintiff, Joel Allen, Student Coordinator for the St. Louis area for McCarthy for President, a member of SDS, a member of the peace movement, and a member of the American Civil Liberties Union, has participated in many demonstrations in the St. Louis area, but has never been arrested. He was removed from the Arch area on one occasion when he was distributing literature for McCarthy and told that he *1396 would have to move four blocks back from the area since he could not distribute political literature within four blocks of a federal highway. The police accompanied him, holding onto his arm, for the four blocks, and then left him to carry on his literature distribution. He complained that the policeman called him a hippie, a nasty name, and asked when he last took a bath. This witness stated that he knew of no threats of arrest and had never been arrested, that he didn't represent either of the other parties in the lawsuit and none of them represented him, and that he had no authority to represent anyone.
Of the remaining 28 witnesses, over half of them had never been arrested for anything and knew little, if anything, about the arrests of others. Three ministers testified. Reverend Roger A. Harless, a Presbyterian minister with Presbytery, who was the adviser and chief money raiser for the Black Liberators, had been stopped by the police on one occasion after he had driven around two or three blocks several times late at night and asked if he were lost.
Reverend Robert Wilden, a minister of the Second Presbyterian Church, was the chief adviser and money raiser for the Zulu 1200's, and Reverend Walter Witte, Episcopalian minister, was one of the chief advisers and money raisers and a member of ACTION.
Of the three ministers, Reverend Witte was the only one who had actively participated in any number of demonstrations. He had participated in at least fifty demonstrations and had been arrested only once, and that occurred at Kiel Auditorium, the Veiled Prophet incident referred to above. He testified that the police didn't bother them as long as they remained on the opposite side of the street where they were told to stay, and were only arrested after they crossed the street and the incident referred to above occurred. He further testified that only once in the many demonstrations in which he participated had there been a threat of arrest, and that in the last year in the demonstrations in which he had participated police had never threatened to arrest him. He stated that he was in favor of the members of the various groups here carrying firearms, which is rather unusual.
Of the balance of the witnesses who were arrested, a substantial part of the arrests were on charges not involved in any of the three ordinances referred to in the complaint, and for the most part dealt with interfering with police officers, traffic violations, which in most instances the witness admitted were proper and to which they pled. One of the witnesses, Gutherie, did not even complain of the arrest and his conviction, but only of the court procedure. A number of the arrests were peace disturbances, but the arrest had nothing whatever to do with demonstrations.
The record is totally devoid of any evidence to support the allegations of the complaint. No credible evidence supports the existence of any agreement, in fact, tacit, or otherwise by implication, to do or cause to be done the acts complained of.
Because of the plaintiffs' shotgun approach in the complaint, they have placed themselves in a difficult position. Under the Cameron decision, to warrant this court's intervention into the state (city) criminal process plaintiffs must prove by the preponderance of the credible evidence that the situation in St. Louis is one of the "impropriety of (city officials) invoking the statute (ordinance and practices) in bad faith to impose continuing harassment in order to discourage appellants' activities." This they have failed to do. This record before the court is for the most part testimony concerning the events leading up to the arrests, prosecutions, and other harassing acts of the police. However, taken at face value, with the knowledge of their objectivity, on each occasion the person arrested was engaged in activities which could arguably constitute a violation of the ordinance involved. In view of these facts and the rule that the question before the court is not the guilt or innocence of the person charged, but *1397 rather only the good faith or bad faith of the activities of the police, it must be held that the plaintiffs have failed in their proof.
"Ordinarily, the presumption that the State's motive was law enforcement and not interference with speech or assembly will carry the day." Cameron v. Johnson, supra, 390 U.S. at 623, 88 S.Ct. at 1342. Cases such as Lankford v. Gelston, 4 Cir., 346 F.2d 197; Williams v. Wallace, D.C., 240 F.Supp. 100; Houser v. Hill, D.C., 278 F.Supp. 920; and Cottonreader v. Johnson, D.C., 252 F.Supp. 492, do not require the contrary result. In each of these instances, the evidence of bad faith was clear and convincing, and it was apparent that the activities involved were police policy designed entirely to suppress the plaintiffs' activities. The evidence in the present case does not rise to that standard.
Plaintiffs' evidence here shows a total of arrests on 17 occasions (each unrelated) during the three years about which testimony was adduced. Of these 17, only arrests on 8 occasions related arguably to exercise of first amendment rights. Of these arrests, most were based on the peace disturbance ordinance. At the same time, the evidence from witnesses such as Allen, Koch and the Reverend Witte demonstrates that there were during the same period of time literally hundreds of "civil rights demonstrations" which occurred from the evidence without incident.
Plaintiff Allen, although long active in this area, has never been formally arrested. Plaintiff Koch has been arrested twice over the last three years, and on both occasions the charges were not prosecuted after police consultation with the city counselor's office. Plaintiff Green has suffered three arrests. Two of these arrests relate to first amendment exercises, the first on June 7, 1966, at a street rally after he and others had piled trash in the city streets. Ultimately, Green entered a plea of guilty in the Court of Criminal Corrections to the charges arising out of this incident. The second was at the Veiled Prophet Ball held on September 27, 1968, at which time Green was arrested when he attempted to gain entry without a ticket. That case has not yet been disposed of.
Other witnesses testified to other arrest and/or detentions. Some complained of police refusal to accept complaints on police misconduct. A few witnesses testified that police had followed them, implying some sinister purpose.
Other attempts at proving harassment and intimidation are illustrated by the evidence presented which may indicate the presence of heavily armed policemen in the area of the Wall of Respect during a rally there on September 7, 1968. Assuming the presence, it appears that such evidence demonstrates only police preparedness in view of the context in which it occurred, namely, the attack by persons unknown upon the Ninth District Police Station; the attack on the home of Lieutenant Grimes; the arson of Commissioner Gates' office; and the fire and disturbance at 2810 Easton, the headquarters of the Black Liberators. As a matter of fact, the testimony of Wayne Washington, a general of the Black Liberators, testified that on September 7, 1968, at the Wall of Respect, Dent, one of the Black Liberators, was present with an automatic weapon that looked like an M-16, that he had a .38 revolver in his pocket, that the Black Liberators were armed and protecting Adam Clayton Powell, and the court takes judicial knowledge of the fact that in the case of United States v. Thomas, D.C., 299 F.Supp. 494, a case before this court, after this incident the defendant therein, a Black Liberator, pled guilty of being in the area with a sawed-off rifle, and he pled guilty only after he was confronted with a picture from one of the newspapers showing him in the street with the rifle. No evidence adduced indicated any police interference with the conduct of this rally nor was any chilling effects demonstrated. *1398 Indeed, it must be kept in mind that only impermissibly motivated chilling is unconstitutional.
Further, much time and transcript space is devoted to testimony relating to the incidents of September 4th and 5th at 2810 Easton, during which period the car of the Black Liberators was destroyed by fire, and shots and/or rocks were thrown through the windows and certain items disappeared from the inside. The plaintiffs take Exhibits 26, 27, 28, 29, 30 and 31, and the testimony of two firemen and one witness, Wright, and urge that the composite demonstrates that these incidents were a police retaliation from the attacks on the station, Lieutenant Grimes and Commissioner Gates. On the contrary, the absolute most that the credible evidence shows is that the car did burn; that someone unknown shot or threw rocks through the windows, that a police van and several policemen, including Lieutenant Grimes, arrived on the scene in response to the fire report and a report of gun shots, and an inference from Plaintiffs' Exhibit 4 that police entered the building and seized as evidence certain items, namely a flag, bullets of an M-I rifle, arrows and a cross-bow. The witness Wright's purported identification of Lieutenant Grimes as the person firing the shots is ludicrous, as revealed during cross-examination.
The police conduct described in this record is far more compatible with a sincere, good faith effort to prevent riot and fight crime than with that urged by plaintiffs. The area in which most of the incidents occurred is one of the high crime areas of this city (Deposition of Bronstron). If overzealous reaction is apparent on the record in some cases, it is only because of the situation in which, of course, police officers are found to be only human. The appearance of testimony that certain police officers have resorted to insult and profanity, and to rough handling of recalcitrant suspects, which acts are contrary to the standing orders of these defendants (Deposition of Bronstron, p. 4), is not sufficient to warrant federal judicial intervention.
A federal injunction dealing with state law enforcement is an extraordinary remedy. It requires much to induce its use. Plaintiffs have here failed to make the necessary showing of bad faith enforcement for the purpose of harassment and chilling required. They have failed to show the required irreparable injury under Cameron, or of the special circumstances that would warrant federal disposition of the normal pattern of law enforcement.
For these reasons, this court must deny to plaintiffs the relief requested in their complaint in respect to the alleged conspiracy and plan or scheme of concerted action to deprive plaintiffs of their constitutional rights. Plaintiffs have failed to prove their allegations.

III. City Ordinances.

Plaintiffs seek a declaratory judgment as to the constitutionality of three ordinances of the City of St. Louis and further seek an injunction to prevent their future enforcement.
In Zwickler v. Koota, supra, 389 U.S. at 254, 88 S.Ct. at 399, the Supreme Court stated:
"It follows that the District Court's views on the question of injunctive relief are irrelevant to the question of abstention here. For a request for a declaratory judgment that a state statute is overbroad on its face must be considered independently of any request for injunctive relief against the enforcement of that statute. We hold that a federal district court has the duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunction."
The law so enunciated has been made even more certain by the court's approval of the District Court's action on remand in Cameron v. Johnson, supra, 390 U.S. at 615, 88 S.Ct. 1335, footnote 5, *1399 wherein on remand the district court first proceeded to render an appropriate declaratory judgment.
In the Zwickler case, the District Court there likewise issued a declaratory judgment. Thereafter, in Golden v. Zwickler, supra, the Supreme Court reversed, holding the case to be one inappropriate for such action. It follows that guided by the two Zwickler cases, this court must determine the appropriateness and the merits of this request.

(1) Loitering, § 765.010.
The evidence presented at trial reveals only one incident in which a party or member of the class was arrested or threatened with arrest under this section. That was the plaintiff Koch at a demonstration in the vicinity of the Chase-Park Plaza Hotel on the occasion of a visit by Vice President Humphrey on December 8, 1968. The charge was, however, later dismissed. No other evidence was presented as to the actual or threatened use of the ordinance. "The mere possibility of erroneous application of the statute does not amount `to the irreparable injury necessary to justify a disruption of orderly state proceedings'" Cameron v. Johnson, supra.
In Golden, supra, the court stated, l.c. 394 U.S. 110, l.c. 89 S.Ct. 960: "The constitutional question, First Amendment or otherwise, must be presented in the context of a specific live grievance." See also, Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826; Evers v. Dwyer, 358 U.S. 202, 79 S.Ct. 178, 3 L. Ed.2d 222; United Public Workers of America v. Mitchell, 330 U.S. 75, 89-90, 67 S.Ct. 556, 91 L.Ed. 754; Liverpool, N.Y. & P.S.S. Co. v. Commissioners, 113 U.S. 33, 39, 5 S.Ct. 352, 28 L.Ed. 899; United States v. Raines, 362 U.S. 17, 21, 80 S.Ct. 519, 4 L.Ed.2d 524 (all cited with approval in Golden).
The same principle was stated in a slightly different manner in Frothingham v. Mellon, 262 U.S. 447, 448, 43 S.Ct. 597, 67 L.Ed. 1078, when the court stated that the power exists to declare a statute unconstitutional only where the plaintiff is "able to show, not only that the statute is invalid, but that he has sustained, or is immediately in danger of sustaining some direct injury as a result of its enforcement." See also, Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586.
In view of these standards, this court is of the opinion that under the evidence presented in this case, in relation to this ordinance, it is inappropriate for declaratory relief. There is no reason to believe that the state court system in this state is incapable or unwilling to apply the appropriate federal constitutional standard as enunciated in Shuttlesworth v. City of Birmingham, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176, to this section of the Revised Code should the occasion arise for its enforcement. More specifically, no sufficient live controversy exists in the language of Golden, nor does a sufficient threat of enforcement appear to warrant intervention under the rule of Dombrowski.

(2) Unlawful Assembly, § 763.010.
In this instance, four members of the class were arrested on September 7, 1968, for violation of this ordinance. They were convicted in City Court No. 1 and their consolidated cases are now pending on appeal in the Court of Criminal Corrections. Therefore, in this part, the specific live grievance and the immediate danger of injury do exist.
Under the above situation the issue is apparent: Does the language of the Supreme Court in Dombrowski, supra, 380 U.S. at 489, 85 S.Ct. at 1122, where it stated, "We hold the abstention doctrine is inappropriate for cases such as the present one where * * * statutes are justifiably attacked on their face as abridging free expression," require this court to interject itself into the midst of the orderly administration of state court procedure which has reached the appellate stage?
While this ordinance is different from the state statute on the subject, § 562.150 *1400 recently sustained by a three-judge court in this district, Rollins v. Shannon, D.C., 292 F.Supp. 580, 589, and is subject to some constitutional doubts, and while further doubt exists as to its validity under the Missouri decision of City of Cape Girardeau v. Pankey, Mo. App., 224 S.W.2d 588, there are three basic reasons why the above stated issue must be answered in the negative.
In Dombrowski the Supreme Court noted that it was peculiarly inconsistent with the basic principles of federalism for the federal judiciary to interfere with the orderly good faith administration of justice. The language of the case, particularly as interpreted in Zwickler and Cameron, is tempered and cautious. The burden imposed by Cameron on those seeking to interfere is great. The court finds that on the record this burden has not been met in relation to this ordinance. As previously noted in this opinion, the mere possibility of an erroneous application is not sufficient. Of the four members of the class charged and convicted, only Mr. Washington testified. To say the least his testimony did not establish any semblance of irreparable injury sufficient to warrant interposition in the state proceedings at the appellate level. No evidence demonstrates that this prosecution has "chilled" any First Amendment rights or freedoms. No evidence points to the existence of any plan or scheme to use the ordinance to so curtail those precious rights. There is no evidence of threats of future prosecutions. In short, the court finds that upon the record insufficient evidence exists to warrant intervention. Of course, a declaratory judgment is within the sound discretion of the court, 28 U.S.C.A. § 2201. In view of the principles of comity and federalism applicable to our dual court systems, an exercise of such discretion for intervention would be particularly repugnant to our system. See generally, Brooks v. Briley, 274 F.Supp. 538, aff'd 391 U.S. 361, 88 S.Ct. 1671, 20 L.Ed.2d 647.
Second, to grant the relief prayed for in relation to this section of the Code would have the effect of releasing the four individuals from state custody. In the view of this court this would constitute an unauthorized extension of 28 U. S.C.A. § 2254 dealing with release of prisoners from state custody.
Finally, the court is of the opinion that the clear provisions of 28 U.S.C.A. § 2283 stand as a bar to both the purely equitable and the declaratory relief requested. The Supreme Court in Dombrowski and Cameron, was careful to not rule on this precise issue. Opinion, among the lower courts is split. Several district courts and the Fourth, Sixth and Seventh Circuit Courts of Appeal have ruled that section 2283 is such a bar and that sections 1983 and 1985 are not exceptions thereto. See, e.g., Baines v. City of Danville, 4 Cir., 337 F.2d 579, cert. den. Chase v. McCain, 381 U.S. 939, 85 S.Ct. 1172, 14 L.Ed.2d 702; Sexton v. Barry, 6 Cir., 233 F.2d 220; Wojcik v. Palmer, 7 Cir., 318 F.2d 171, cert. den. 375 U.S. 930, 84 S.Ct. 331, 11 L.Ed.2d 263. Four district courts and the Third Circuit have reached the contrary result. Cooper v. Hutchinson, 3 Cir., 184 F.2d 119; Carmichael v. Allen, D.C., 267 F. Supp. 985.
This court agrees with the majority view as expressed by Brooks v. Briley, 274 F.Supp. 538, 553, aff'd 391 U.S. 361, 88 S.Ct. 1671, wherein it was said:
"The weight of authority and the better reasoned approach require that Sec. 2283 prohibits the enjoining of these state proceedings and that Sec. 1983 is not an `expressly authorized' exception to Sec. 2283. To hold otherwise would be to create a vast exception to Sec. 2283 and would do violence to the principles of comity and federalism which underlie it * * *. Furthermore, it is clear that the prohibition under Sec. 2283 against enjoining state court proceedings cannot be avoided by seeking a declaratory judgment. H. J. Heinz Co. v. Owens, 9 Cir., 189 F.2d 505, cert. den. 342 U. S. 905, 72 S.Ct. 294, 96 L.Ed. 677. The same principles of comity and federalism require that when injunctive *1401 relief is not appropriate, neither is relief appropriate under the declaratory judgment statute."
Thus, no federal intervention by way of injunction nor by way of declaratory judgment would be appropriate here.

III. Public Disturbance of the Peace, § 762.030.
Here, as in the case of the unlawful assembly ordinance, it is clear that the specific live grievance and fear of direct injury exist. This ordinance has been on the books for many, many years; there have been many arrests and prosecutions under it; and from the evidence it appears that there will be more. It should be borne in mind, however, that the facts in this case clearly indicate that this ordinance has not been used for the purpose of abridging free expression or applied for the purpose of discouraging protected activities. Various witnesses, as previously set out, have participated in as many as fifty or more demonstrations, and the most that any of them were arrested was once.
The testimony discloses that the police were present at most, if not all, of the hundreds of demonstrations referred to in the testimony, and they made no effort to do other than to see that the demonstration was orderly, and in some instances to protect the demonstrators. The record indicates when we consider the activities of the various witnesses that the demonstrations in which they were involved were many and varied and the most that they could come up with as to arrests arising out of demonstrations for the violation of this ordinance were eight arrests over a three-year period. Details with respect to those arrests show that the arrests were not made to prevent demonstrations but only after demonstrations got out of hand and the police to prevent further trouble stepped in. The record with respect to demonstrations clearly shows that hundreds have taken place in St. Louis in this three-year period with the police in attendance, without incident. There is no testimony of threats by the police of arrests with respect to demonstrations.
The court in Douglas v. City of Jeanette, supra, 319 U.S. at 164, 63 S.Ct. at 881 had this to say: "It does not appear from the record that petitioners have been threatened with any injury other than incidental to every criminal proceeding brought lawfully and in good faith."
This language is applicable to the situation before the court. No person should be immune from prosecution in good faith for his alleged criminal acts. Great reliance is placed by plaintiffs on Dombrowski, supra, but the Supreme Court in that case cites the Douglas case, supra, with approval, and as I read the case requires special circumstances which have a chilling effect upon the exercise of First Amendment rights to exist in order to make the abstention doctrine inapplicable. This court finds no special circumstances to warrant cutting short the normal adjudication of constitutional defenses in the cause of a criminal prosecution. The evidence demonstrates that this ordinance has not been used for the purpose of a chilling effect upon the exercise of First Amendment rights, the basis for this court injecting itself into their constitutionality as referred to in Dombrowski, supra.
In line with Douglas, supra, since this ordinance has not been used as a chilling effect to First Amendment rights, it is an appropriate case for the abstention doctrine set out in Douglas, supra. There are many cases filed under this ordinance and there are cases pending under this ordinance, as the exhibits indicate. What has been said in this connection with respect to the other two ordinances is equally applicable as to this one. The most that can be said in criticism of the ordinance would be that some of the words are vague, and while the court in view of its abstention in this matter does not deal with the ordinance in detail, attention is invited to *1402 Zwickler v. Bell, D.C., 270 F.Supp. 131, aff'd 391 U.S. 353, 88 S.Ct. 1666, 20 L. Ed.2d 642.
This memorandum opinion is adopted by the court as its findings of fact and conclusions of law, and the clerk will prepare and enter the proper order dismissing the action and giving judgment to the defendants herein. Costs will be taxed in full against the plaintiffs.